## VOLUME 111.

## CASES ARGUED AND DECIDED IN THE SUPREME COURT OF LOUISIANA.

AT TERM BEGINNING FIRST MONDAY OF NOVEMBER, 1903.

(35 South. 362.)

No. 14,570.

BEUGNOT v. TREMOULET.

(June 22, 1903.)

PRINCIPAL AND AGENT—FUNDS FOR INVESTMENT—INTEREST.

1. An agent who causes the party from whom he has received funds to believe by his representations that they are profitably invested in his hands, and thus led him not to attempt to change the agency or withdraw the funds, cannot, no matter what his motives for the action may be when called on to account, urge that the funds were deposited all the time in bank, and that he was not called on to make investments.

2. A person intrusted by the mother of a minor, living with her mother in Germany, with the interests and property of the minor in Louisiana, who deposits confusedly with his own the funds of the minor to his own account in the local banks, checking against the same at will, obtains a basis for credit therefrom, and is chargeable with interest thereon. Legally considered, he uses the money for his own purposes, though the amount checked out may have left on deposit an amount sufficient to cover the funds belonging to the minor.

(Syllabus by the Court.)

111 LA.—1

Appeal from Civil District Court, parish of Orleans; Thomas C. W. Ellis, Judge.

Action by Josephine Beugnot against Henry Tremoulet. Judgment for defendant, and plaintiff appeals. Reversed.

See 52 La. Ann. 454, 27 South. 107; 106 La. 546, 31 South. 135.

Solomon Wolff, for appellant. Charles Louque, for appellee.

### Statement of the Case.

NICHOLLS, C. J. This is the third occasion upon which this case has appeared before this court. The issues presented and our past action upon them can be seen by referring to 52 La. Ann. 454, 27 South. 107, and 106 La. 546, 31 South. 135.

The action was instituted by plaintiff to obtain judgment against defendant for moneys for which she alleged he was responsible to her as her agent. The cause was first remanded to enable plaintiff to amend her pleadings so as to present her demand in a form different from that in which she had

2

brought it, and in order that she might in the district court contradictorily with defendant fix the amount and dates on which and from which interest was to be allowed, credits given, etc.; in other words, "to have adjusted the accounts between them on the basis determined by this court." When the case was returned to the trial court, plaintiff filed a supplemental petition amending her pleadings in conformity with the views expressed by the court. The prayer of the petition was that an accounting be had between herself and defendant, and there be judgment in her favor and against defendant for such sum as might be found due under the view taken by the court in its opinion. The defendant filed exceptions, which were overruled. The case went afterwards to trial, with the result that the district court rendered a judgment which was tantamount to continuing the case in order that the defendant might file an account of his agency to conform to the facts found by the Supreme Court expressed in its former opinion, and directing him to do so.

Defendant appealed from this judgment. The Supreme Court affirmed the judgment. In its opinion rendered on that appeal this court used the following language:

"Defendant, in his account filed on the former trial of the case, had made no allowance of interest to plaintiff on funds of hers he had received and used. His account merely gave amounts of moneys he had received for her, and dates when received and amounts remitted her from time to time and the dates of remittances. He, having mingled her funds with his own, and employed the same for his own use, was answerable for interest thereon, and this court might have in its former judgment (and said so at the time) taken the account as a basis for a decree against him figuring out what he owed on an allowance of interest against him according to the rule of partial payments. But it was considered that defendant may not have used for his own purposes all the funds of the plaintiff which his account showed, and which had not been remitted, and might be able to make a satisfactory showing in this regard on another trial, thus perhaps relieving himself of interest on part of the amount. Accordingly partly, at least, in order that he might make this showing, if it

were possible to make it the cause was remanded."

"The opinion of this court on the first appeal settled several matters then in dispute and at issue, and removed the same beyond the domain of further controversy. Among others, it settled that the defendant became the agent of the plaintiff to act for her—represent her—collect, receive, and receipt for moneys coming to her from her grandfather's estate—and that the agency had continued for about 11 years when the suit was filed in April, 1898.

"It settled that defendant during this agency collected from time to time various sums of money for account of the plaintiff, and made her various remittances extending through the period of the agency.

"It settled that funds of the agency which had come into defendant's hands, and which had not been remitted to her, were mingled with his own funds, and those of plaintiff he thus mingled as a common fund, with which he purchased stocks, bonds, etc., in his own name and for his sole account.

"It settled that defendant, having used his principal's funds in his own affairs, was answerable to her for interest on the same, and that he should account to her for 5 per cent. per annum interest upon such funds of hers so used from the time they were so employed, and this according to the rule laid down in Civ. Code, art. 2164—that of partial payments.

"It settled that the interest to be thus accounted for should not be computed beyond the date of the payment by defendant of the amount awarded against him by the trial court; this for the reason that had the plaintiff, at the time she filed her suit, properly set forth her demand against him, there would have been final settlement of these affairs on the first trial, and that, since it was largely from her fault in pleading the case had to be remanded, she should not, in good conscience, be permitted to demand interest for the delay which she herself had occasioned."

In our decree affirming the second judgment of the district court it was said:

"Should defendant fail to avail himself of the opportunity thus for the second time offered him of recasting his account on the lines laid down by this court, and in conformity with its views, it is ordered that the

district judge proceed to adjustment of the accounts between the parties litigant, taking as a basis for same the former account filed by the defendant, and calculating legal interest against him on all sums received by him from the date of reception according to the rule of partial payments"—and defendant was ordered to pay the costs of appeal.

The account referred to in this decree as that which had been filed by defendant was as follows:

Miss Josephine Beugnot, Weisbaden, in Account with Henry Tremoulet, New Orleans.

One-Ninth Interest in the Succn. of J. F. Beugnot.
Cr.

| | | | | | |
|---|---|---|---|---|---|
| July | 1888 10 | By | cash rec'd of executor... | $ 2,000.00 |
| Jan. | 1889 21 | " | " " int Wogan note | 170.00 |
| June | " 11 | " | " " " . " " | 10,223.53 |
| Jan. | 1890 19 | " | " " " " " | 170.00 |
| Jan. | 1891 20 | " | " " " " " | 170.00 |
| Aug. | 1891 4 | " | " " " " " | 127.78 |
| Feby. | 1893 1 | " | " " 2 yrs int Wogan note | 340.00 |
| " | 1894 15 | " | " " int Wogan note | 170.00 |
| Mch. | 1895 1 | " | " " int Wogan note | 170.00 |
| July | " 6 | " | " " 1/9 of Wogan | |

Note $2,833 33
6 Mos Int
Wogan Note 85...................... 2,918.33

$16,459.64

Dr.

| | | | | | |
|---|---|---|---|---|---|
| May | 1888 30 | To | exchge. Un. Bk. on Paris pr. 540a 5.10................. | $ 98.04 |
| July | 1888 18 | To | exchge State Nat. Bk. on Heine & Co. fr. 5,150 a 5.15.. | 1,000.00 |
| Nov. | 1888 5 | To | exchge deposit with White & Saunders atty's for cost of court .................. | 11.35 |
| April | 1889 4 | To | paid bill for Edg. Grima, Notary ........... | 17.50 |
| June | 1889 27 | " | " White & Saunders Attys fees for professional services.. | 450.00 |
| June | 1889 27 | " | " bill balance costs of Court ........... | 6.05 |
| June | 1889 27 | " | " bill Edg. Grima Notary ............... | 18.00 |
| Aug. | 1889 28 | " | Exchge State Nat. Bk. on Deutsche Bk. R/M 4,000...... | 980.00 |
| Jan. | 1890 18 | " | " State Nat. Bk. on Deutsche Bk. R/M 704.65.... | 170.00 |
| Aug. | 1890 26 | " | " State Nat. Bk. on Deutsche Bk. R/M 4,188.48.... | 1,000.00 |
| Jan. | 1891 29 | " | " State Nat. Bk. on Deutsche Bk. R/M 705.55..... | 170.00 |
| Sept. | 1891 3 | " | " State Nat. Bk. on Deutsche Bk. R/M 4,166.66... | 1,000.00 |
| Sept. | 1892 27 | " | " State Nat. Bk. on Deutsche Bk. R/M 2,083.35... | 500.00 |
| Feb. | 1893 | To | paid State Nat. Bk. on Deutsche Bk. R. M. 2,080.60 ....... | 500.00 |

$ 5,920.94

| | | | | |
|---|---|---|---|---|
| | | Amount brought forward............... | $ 5,920.94 |
| Feb. | 1894 16 | To paid Exchange, State Nat. Bk. on Deutsche Bk R. M. 2,077.90 | 500.00 |
| Sept. | 1894 1 | " " State Nat. Bk. on Deutsche Bk. R. M. 2,077.92 ........ | 500.00 |
| April | 1895 6 | " " State Nat. Bk. on Deutsche Bk. R. M. 704.65 .......... | 170.00 |
| Jan. | 1896 23 | " " State Nat. Bk. on Bk. R. M. 706.50... | 170.00 |
| Mch. | 1897 10 | " paid to Mr. A. D. Schreiber Commr 2½% amts collected $16,459.64 ...... | 411.49 |
| July | 1897 13 | " balance cr. ................. | 7,787.21 |

$16,459.64

July 1897 13 By balance brought down.... $ 7,787.21
New Orleans La.
July 13th 1897
(Signed) Henry Tremoulet
A true copy.

When the second judgment of this court became final, it was on motion of plaintiff's counsel filed in the district court, and the case ordered to be proceeded with.

The defendant answered under reservation of an exception filed by him. He declared that he, under protest, rendered an account, in which he stated what sums of money he employed for his own use, when he employed the sums, and what period of time he continued to use the same, and to fix the amounts and dates on which interest was to be allowed, and dates on which and from which interest was to be allowed and credits given by reason of his use of the money.

He averred that he did not make use of plaintiff's money immediately on receipt of the same; that he had for his own account more cash than he received for plaintiff's account. That he had made a faithful search of all his books and papers, and had been unable to find the same; that unfortunately his sight had been and was still impaired to such an extent that he had to rely on the efforts of others for a search of his books and papers; that he designated the place where, to the best of his knowledge and belief, they would be found, but it was reported to him that after diligent search they could not be found; that being, therefore, without memoranda, he had to rely exclusively on his memory to fulfill the conditions and requirements of the judgment; that the question he was called upon to answer never entered his mind at the time of his dealing with plaintiff, and therefore in answering the requirements of the judgment he was doing so to the best of his knowledge and belief; that

he still denied that he was indebted to plaintiff in any sum of interest, and the statement which he furnished was not to be construed into a confession of judgment; that he denied having been the agent of the mother of plaintiff, who was not her tutrix.

| In 1889 | in the month of August | ...... | $9,401.10 |
| | September | ... | " |
| " 1890 | March | ...... | 8,401.10 |
| | April | ...... | " |
| " 1891 | " | ...... | " |
| | May | ...... | 8,401.10 |
| " 1892 | Jany. | ...... | 7,247.51 |
| | Feby. | ...... | " |
| | Mch. | ...... | " |
| " 1893 | " | ...... | 6,427.00 |
| | Aug. | ...... | " |
| | Sept. | ...... | " |
| | Oct. | ...... | " |
| | Nov. | ...... | " |
| | Dec. | ...... | " |
| " 1894 | Jany. | ...... | |
| " 1895 | May | ...... | 5,427.00 |
| " 1896 | Dec. | ...... | 8,345.84 |
| " 1897 | May | ...... | 7,345.84 |
| | June | ...... | " |

Defendant declared he made use of the various amounts mentioned above during the months above set forth, and no longer.

That even said use was problematical, inasmuch as he was always ready to refund plaintiff the money which he had in his hands at a moment's notice. He pleaded the general issue, and denied being under any indebtedness to plaintiff.

Defendant on the trial became a witness on his own behalf. He testified to his physical condition; that unfortunately he could neither read nor write, suffering with both eyes; that the answer which he filed had to be prepared by his counsel; he had to be assisted by one party or another whenever he had anything of that kind to do; the answer was the best he could do from memory; he was ready at any moment to have paid the plaintiff any sum for which she had a claim against him, and paid as soon as he had an acknowledgment of what he owed, and when he was called upon he paid immediately; took no legal delays, and was all ready to pay the amount. On cross-examination he said he swore to the best of his memory's belief that the amounts set forth in his answer were the only amounts that he had ever used in his business, and for the time that was therein set forth. He

could not swear absolutely there were no books or papers or documents of any kind in existence which would show the exact condition of the account existing between plaintiff and himself, he said, but he could say he could not find them. He had instructed parties to make diligent search for them. One of the parties was his brother. He lived in the city, but was not in the courtroom.

At the time he made out the account filed in his original answer he had a memorandum from which he got his data, but he had lost his sight, and did not know where to find it. It was not kept in a book. He could not say it was lost, but his brother could not find it. His recollection was that in August and September, 1889, he had $9,401 on hand; that he used during August and September $9,401. If, according to the account which he had alluded to, he had on hand in November $9,812, that was the correct amount at that time. Being told that during March and April his present statement showed he had on hand $8,401, while his original account showed $9,812, he answered, "Possibly there may have been some payments or remittances made that would reduce it to that amount;" that was all he could tell. Asked whether what he had just said in reference to the two amounts would hold good as to all variations that might exist between his present account and the old one, he said he supposed that, as a rule, it would. Being asked, "You say you used those sums only during the months set forth in his present account?" he said, "Yes, as he had moneys of his own." At the time he was president of the Importers' Warehouse, he did not keep that account in connection with his account for the Importers' Warehouse. He kept his personal account in various banks —the Union-Citizens' Branch Department of State Bank, and perhaps others. He would have to look up the books. He did not have the bankbooks. He had not been able to find them by himself. He could not find them. He did not think he could get any memorandum from the banks which would enable him to make a correct account in this case. He did not know whether the bank account would show the amount of money he had on hand. Possibly it might. Admitting it was so, he never inquired; he did not see what difference it would make.

The following were answers to additional questions propounded to him:

"Q. You have testified that as this money was received you mingled it with your own funds; is that right?

"A. I believe so, sir.

"Q. Did you do that?

"A. Yes, sir; I did not keep a separate account of that money.

"Q. You deposited that money to your credit as you would moneys that belonged to you.

"A. Yes, sir.

"Q. I believe you stated that you bought with your moneys city 4's?

"A. No, not city 4's.

"Q. What did you buy?

"A. Premium bonds.

"Q. I believe you stated at the time the reason you bought those bonds with the money was that you wanted to be able to convert them at any time into cash to pay the debt?

"A. If necessary.

"Q. If necessary?

"A. Yes, sir.

"Q. In making these investments in premium bonds, did you make investments of any special amounts?

"A. No, sir.

"Q. At what time did you make those investments?

"A. Oh, I can't say exactly, sir. One to three months after having the money, possibly. I don't remember.

"Q. You bought the premium bonds, I presume, just as soon after the receipt of the money as you thought was a favorable location; is that right?

"A. I can't say, but either the money would be there or the bonds would be there. I don't remember whether one, two, or three months after.

"Q. You considered at all times the bonds were there in place of the money?

"A. In case I did not have the money.

"Q. You wanted them there so as to be able to pay the money at any time?

"A. As an absolute guaranty; yes, sir.

"Q. You utilized the money for the purchase of premium bonds?

"A. With my own money together; Yes, sir.

"Q. Did you keep the premium bonds in hand for any length of time?

"A. I don't remember how long. I might have had the money there, and I might not keep the bonds if I had the money.

"Q. At the time you paid the judgment of $7,700, did you have premium bonds in hand?

"A. No, sir; I had the money.

"Q. You had the premium bonds too?

"A. I don't know if I did at the time.

"Q. Had you sold the premium bonds that you had purchased?

"A. If I did not have them, I must have sold them.

"Q. You sold the premium bonds, then, irrespective of the liability to this minor?

"A. When I had the money on hand, yes.

"Q. You did not sell the premium bonds for the purpose of paying her?

"A. No, sir.

"Q. You invested her money and yours to purchase premium bonds, and you held them so as to be perfectly sure you could get the money, if you did not have it, in order to be able to pay her whenever she demanded it?

"A. I said I had bonds when I did not have the money.

"Q. Outside of the bonds you frequently had money, so that when she called on you for money you did not have to sell the bonds?

"A. Yes, sir.

"Q. At the time you held the bonds?

"A. I don't know how long I held them.

"Q. Why did you sell them?

"A. I don't know; thinking they might go down—fluctuating.

"Q. Possibly you realized a profit on them was the reason?

"A. No, possibly to avoid a loss.

"Q. Is it not true, Mr. Tremoulet, that premium bonds have not in the last ten years gone down at all?

"A. I can't say that. They are going down now. They have been higher than now.

"Q. When was the period at which they reached their highest point?

"A. I don't know.

"Q. Is it not a fact they were at their highest point some two or three years ago?

"A. I don't know.

"Q. At the time you sold the premium bonds, do you know if you realized a profit or not?

"A. No, sir; I did not realize a profit.

"Q. Did you sustain any loss?

"A. I can't say.

"Q. You remember you did not realize a profit?

"A. Yes, sir; I may have come out even, or a little lower.

"Q. Do you remember how much you paid for those premium bonds?

"A. No, sir.

"Q. Do you remember who you sold them to?

"A. No, sir; because I have dealings with different parties.

"Q. Until you paid the $7,700, you felt in duty bound to keep those premium bonds on hand that you purchased as a guaranty to pay the money whenever called upon to do so?

"A. No, sir.

"Q. That is not right?

"A. No, sir; I told you when I had the money I did not think it necessary to keep the bonds, and I had the money mostly all the time.

"Q. But your original intention in investing in those bonds was to make sure that whenever called upon you would have the money—that you could realize on them?

"A. Yes, sir.

"Q. And you kept those bonds on hand until you had enough money to satisfy you you would have enough to pay whenever called upon?

"A. I can't say how long I kept them. If I had money in bank, I would not sell them, but if I thought the money would be wanted for that account, and I did not have enough on hand, I would sell the bonds.

"Q. In making your investments, did you at all times make your investments so you would have enough on hand to pay what this young lady claimed?

"A. I had more than necessary.

"Q. Did you always bear that in mind?

"A. Yes, sir; I bore in mind I had to pay it whenever called upon.

"Q. Did you keep a sufficient amount of money on hand for that purpose?

"A. In cash or bonds; yes, sir.

"Q. You did not say, 'I owe this young woman so many dollars and money I cannot invest?'

"A. No, sir.

"Q. You did not say that to yourself?

"A. No, sir.

"Q. You invested and paid your investments entirely regardless of this young woman?

"A. I knew what I owed her, and I had enough to pay her in cash or bonds on hand.

"Q. You handled your funds entirely regardless of what you owed her, because you knew you had enough?

"A. No, not exactly; a man who owes money knows he must be prepared to pay when called on.

"Q. I will put it in this way: In making your investments you did not make them with the view always of keeping on hand enough cash to pay the plaintiff in this case, did you?

"A. I do not catch on to your question.

"(Question repeated).

"A. I made investments of moneys so that either with my cash or bonds I could always settle, when called on, with this lady.

"Q. Then when you had the cash on hand ready to pay her, it was not the result of design; it was merely that for the time being you did not find a profitable investment, is that it?

"A. No, I might have had both cash and bonds at certain times.

"Q. Suppose, Mr. Tremoulet, at any one time you had ten thousand dollars cash on hand in bank, and you were offered a very profitable investment, one that you could sell at almost any time, would you have invested your whole ten thousand dollars?

"A. I would have kept a certain amount on hand for other requirements.

"Q. How much in round figures?

"A. I can't say: it depends on circumstances.

"Q. Would the amount you would have kept on hand been an amount sufficiently large to meet this claim?

"A. Possibly not. I explained that to you already.

"Q. It all amounts to this, Mr. Tremoulet: In all your investments during the long time you had this money in hand you invested and handled this money just exactly as you would your own money?

"A. With enough securities on hand to meet this obligation.

"Q. I would like to call your attention to this: [question repeated]. Say 'Yes' or 'No' to that question, and then you can explain?

"A. I repeat 'Yes,' with what I said before."

Case closed.

The district court rendered judgment in favor of the plaintiff for $650, declared to be for interest on the basis of the calculation directed by the Supreme Court. It further condemned the plaintiff to pay the costs, and she appealed.

### Opinion.

In the Supreme Court the defendant, after the cause had been submitted, filed what he designates an answer to the appeal, and suggested, among other matters, that the court was without jurisdiction in the premises ratione materiæ. Had there been any warrant for this suggestion, we would have taken notice of the matter of our own motion, but we find no ground for declining to consider the appeal. The district judge used the following language in his reasons for judgment:

"If this were a case of wrongdoing or fraudulent withholding of plaintiff's funds on defendant's part, I would not hesitate to mulct him for interest on the entire amount which he had. But such is not the case. The plaintiff's grandfather long ago selected the defendant as the trustee to hold her moneys. The grandfather had no confidence in plaintiff's mother, deeming her a spendthrift; and, moreover, plaintiff was a minor, living with her mother, and at times not on the best terms. The mother was not plaintiff's tutrix, and from first to last she was urgent and persistent in her demands on defendant for the money coming to plaintiff. The grandfather was defendant's friend, and charged him to hold the funds until plaintiff should become of age—not 21, but 25 years, by the law of Germany, where she and her mother were.

"To keep the funds from plaintiff's mother, defendant did write evasive and deceptive letters. He did conceal * * * from the mother, who was not tutrix, and against whom the grandfather, from whom all of plaintiff's rights came, had warned defendant, telling defendant she was a spendthrift, and would spend and squander plaintiff's money if she got hold of it. But when the plaintiff was coming of age, defendant made full disclosure to her—made out his account. Plaintiff admitted its correctness, and he paid her in full her capital, believing he had a right to commission, which she disputed, and that he owed no interest, which she disputed. That is not all. It is proved, by defendant's efforts, aided by the counsels of Judge White, defendant recovered for plaintiff a large amount which there seemed no hope of realizing when he took charge. This recovery formed the bulk of plaintiff's fortune. Then, instead of fraudulent conduct, we have in defendant a faithful agent, recovering a large amount by good management, for years guarding plaintiff's rights during her minority against her mother, by methods which, while deceptive as to the mother, who had no legal rights to an account, because she was not tutrix, served to keep her at bay, supplying plaintiff's wants liberally; and when at last plaintiff became of age disclosing all, rendering her a true account, and paying her in full.

"If there was ever a faithful agent guarding his trust, and amid difficulties holding the funds till the beneficiary received it safely, this defendant is that agent.

"The Supreme Court approved his commission, but decided that for funds used by him he should pay interest during the time of such use. That tribunal, to facilitate settlement, equitably allowed defendant to amend his pleadings after rejecting plaintiff's excessive demands, and remanded the case, without directions that further proceedings be at the plaintiff's costs.

"The defendant has complied with the decree, and has stated his account, showing the amounts used and time of use, and has sworn to their correctness. He is old and blind, and these matters were long ago, and he has done the best he could, and his testimony is not rebutted. He got assistance from his counsel and brother, and the account now on trial is the result, and he swears to its correctness.

"It is true he did not keep the funds of plaintiff separate from his own, but he was in easy circumstances, and in business; and not for his own profit, or speculative purposes, he bought bonds with his money and plaintiff's for the express purpose of securing the plaintiff. In other words, if called to pay he could convert these bonds (his property, not hers) into cash, and pay her the money due her. He was not her tutor. He

was the agent, selected by her grandfather, to guard these funds from the extravagances of plaintiff's own mother until she should become 25 years of age, and he adopted this method of securing plaintiff against any misfortune that might befall him. All this is proved, and seems just and reasonable.

"Under these circumstances presumptions are not to be stretched against him. He is not a spoliator. He has been true and faithful to his trust amid trying circumstances for years, and he has, after supplying plaintiff during her minority, paid her her entire capital on a true and faithful account, as she has admitted.

"For all this service to plaintiff he has received small thanks, and the scars and bruises of this litigation are his reward for duty faithfully done. He did not speculate with her funds. He used some of her money along with his own to purchase bonds for the sole purpose of securing plaintiff's rights.

"Carrying out the view of the Supreme Court, as is my duty, and no less my pleasure, I have obtained the account from defendant of the money used by defendant, and the account is prima facie established, and is not rebutted.

"The length of time that has elapsed and the peculiar circumstances surrounding defendant's relation to plaintiff, his successful management, his true account and prompt payment, his belief that he was not investing plaintiff's money, but only securing her funds against any loss that might befall him, all induce me to overlook the fact that he kept no separate books for plaintiff, and that he can produce none for this reason. The plaintiff has not called for books or papers or vouchers, and the account rests on defendant's testimony that it is correct. His first account was admitted to be correct, and he has, long before this litigation became warm, paid the full amount to the plaintiff, i. e., immediately after his account was filed.

"His successful management, his long service, and his faithful accounting also corroborate his testimony.

"I have caused calculation to be made, and append a pencil memorandum of the same as part of this opinion.

"It shows $610.59 due plaintiff for interest on the basis of calculation directed by the Supreme Court. For this amount, $610.59,

judgment will be rendered in plaintiff's favor, and, in obedience to the direction of the Supreme Court, the plaintiff is condemned to pay all costs of these proceedings."

The defendant still insists that under the circumstances in which he was placed he was under no obligation to invest the moneys in his hands. He denies that he has used plaintiff's funds, or that plaintiff's mother was her tutrix. He urges still that he was not the agent of the plaintiff, but of plaintiff's mother, and he is under no obligation to account to her.

The defendant has repeatedly recognized plaintiff's right to call him to account, and it is now too late for him to raise that question. He has submitted his account to her, which she disputes, and its correctness is the question before us now. Whether plaintiff's mother was in fact her tutrix is immaterial for the purposes of this suit. Defendant dealt with her as such, or as a party having a right to receive or control the property of the minor. He received the moneys as belonging to the minor.

Defendant admits that all these moneys received by him and retained in different local banks in his own name were deposited and figured exclusively as his money upon his personal account. It would appear that there were bank accounts of two different characters in which defendant was interested—the bank account of the Importers' Warehouse, of which he was president; the other his personal account in different local banks. This latter account he would from time to time increase by new deposits, and from time to time decrease by checks drawn against the fund. The funds of the minor which defendant received he deposited in his own name to his private account. There was a separation of none of these funds into funds belonging to himself and funds belonging to the minor, neither while these were on deposit or after being drawn out. Whatever use may have been made by defendant of the moneys checked out, it was a use in his own name, and not in the name of the plaintiff. Whether the same moneys which had been drawn out or others representing them were returned into bank, or whether the amounts drawn out were simply replaced as to amount by additional amounts derived from other and new sources of supply, does not appear. The moneys of the plaintiff remained during

all those years dead capital so far as the plaintiff was concerned, unless the defendant, by the course which he pursued, made himself responsible to her for the interest. Plaintiff contends that whether he invested her money or not, his declaration (made at the time) that he had invested it estopped him from subsequently denying the fact so to have been, as by so doing he had prevented steps from being taken to place her funds in the hands of parties who would have invested them for her profitably. She maintains that there was nothing to justify the charge that her mother was a spendthrift, or the apprehension that, if she had received her money, it would have been squandered or dissipated. She urges that when defendant placed her moneys in bank in his own name confusedly with his that any funds drawn out from the banks were legally to be considered that part of the moneys belonging to her, and therefore to have been used by him, and rendered him answerable to her for interest under the provisions of article 3015, Civ. Code, and that the mere replacing of the defendant from time to time of moneys equivalent in amount to those that had been withdrawn would not estop the running of interest.

Plaintiff's counsel urges in his brief that it was incumbent upon defendant as agent to have kept regular accounts of all his transactions and dealings on the subject-matter of the agency, together with all necessary vouchers, and, whenever reasonably requested, to make a full and complete statement of the dealings and the state of the account between them; that his failure in this respect authorized inferences unfavorable to him. He urges that defendant failed to keep accounts; that all he did was to keep a memorandum showing the amounts and dates at which he received and remitted funds; that he had at no time books showing how much of the fund was invested, or for what length of time; that he deposited the moneys of the plaintiff to the credit of his own personal account, and used the same from the moment it came into his possession, just as he would his own funds, and, even if there were times when it was not advantageous to invest, it was advantageous at all times to him to have large sums to his credit without any earmarks, as it gave him credit in

bank, and enabled him to take advantage of the market, etc. Counsel refers the court to volume 18, A. & Eng. Ency. of Law (2d Ed.) 1089; Keighler v. Savage Mfg. Co., 12 Md. 383, 71 Am. Dec. 600; Peterson v. Poignard, 8 B. Mon. 309; Mechem on Agency, § 528. Counsel further say: "Whatever defendant's motives were when he as agent deposited the money he collected for the plaintiff in his own name, he must be taken to have used it. Millaudon v. Lesseps, 17 La. Ann. 246, 250. Such a rule is sound in law, in morals, and in policy. When an agent, whatever his motives, deposits his principal's money in his own name, and the depositary fails, the loss falls on the agent. The law does not concern itself with his motive. If the agents wanted to avoid responsibility, all he had to do was to deposit the money in the name of his principal. A. & Eng. Ency. of Law, Vol. 18, p. 1090. The mere deposit in his own name of his principal's funds is a conversion. Cartmell v. Allard, 7 Bush, 482. This is so even where the agent has no funds of his own in bank, and informs its officials that it is a trust fund."

On the subject of interest counsel say: "If the agent receives moneys, and willfully suffers his principal for a long time to remain in ignorance that the debtor has paid, it is but equitable that the debtor should be charged with interest." Dodge v. Perkins, 9 Pick. 368; Clark v. Moody, 17 Mass. 149; Williams v. Storrs, 6 Johns. Ch. 353, 10 Am. Dec. 340; Bedell v. Janney, 9 Ill. 193; Nisbet v. Lawson, 1 Ga. 275.

Where an agent retains money in his hands for 15 years, furnishing no account of the manner in which it has been employed, he will be treated as if he had actually used the fund, and charged with interest as a matter of right. Comegys v. State, 10 Gill & J. 175. It is not only because the agent derives a profit, or the possession of the fund is advantageous to him, that the law makes him pay interest. There is another reason. If he fails to remit or give notice—it may be in perfect good faith—the law holds him for interest from the day he should have given notice. Mechem, § 532; Anderson v. State, 2 Ga. 370; Hinckley v. R. R. Co., 100 U. S. 153, 25 L. Ed. 591.

On the subject of defendant's having mingled confusedly the plaintiff's funds with

his own, counsel refer the court to A. & Eng. Ency. of Law, 1089; Hart v. Ten Eyck, 2 Johns. Ch. 62; Lupton v. White, 15 Ves. Jr. 432; Atkinson v. Ward, 47 Ark. 533, 2 S. W. 77; Central Nat. Bank v. Comm. Mut. Life Ins. Co., 104 U. S. 54, 26 L. Ed. 693.

We have given this case thoughtful consideration, and we have been unable to reach the same conclusion as did the district judge in respect to the rights of the plaintiff in the premises. The defendant should never have deposited the funds of the plaintiff to his own credit in the local banks. In addition to other reasons, he by so doing subjected her to loss from the contingencies of misadventure both of himself and the banks themselves in business. The mere drawing out by him of moneys from time to time from banks and investing them in bonds in his own name gave plaintiff no more security than she had with the funds left on deposit in bank. The deposit of plaintiff's money in bank in his own name gave him credit. Legally considered, defendant was using the money of the plaintiff while matters stood in that condition. Defendant having held out that plaintiff's moneys were advantageously invested, he cannot now say that at that very time and during these many years it was lying profitless to her, deposited in his name in bank. It is said that these statements were justified for the reason that they were necessary to protect plaintiff from her own mother, the party who (in the absence of proof of bad conduct on her part) was entitled in law to have taken charge of and administered her property. The claim made that, in order to guard plaintiff against a mere apprehension set up by the grandfather (not shown to have been at all warranted) of possible injury which might be received from her mother, it was right and proper to subject plaintiff in point of fact to an actual loss by holding her money idle during all these years in bank, is not tenable. The defendant should have taken the responsibility of investing these funds for the minor, and have brought things into the condition he induced the mother to believe they were in. The mother evidently made no objection to the investment of the funds; on the contrary, she thought they were invested, and rested passive by reason of that fact. We are of the opinion that plaintiff is entitled to recover judgment against the defendant for the amounts received by him for the plaintiff as admitted in his former account filed by him, with legal interest from the date of their receipt until paid, subject to the partial payments shown in the same account to have been made by him according to the rule of partial payments.

Plaintiff's counsel has furnished the court, in a brief filed by him, with a detailed calculation of the amount by defendant to the plaintiff on that basis, from which it would appear that the amount for which plaintiff is entitled to judgment is the sum of $5,861.43, with legal interest thereon from May 9, 1899, until paid. The calculation is a tedious one, which we have not verified ourselves. If there be any error in the calculation, the matter can be called to our attention on an application for rehearing. Defendant urges that this court, in its opinion reported in 52 La. Ann. 462, 27 South. 110, stated that interest should not be charged against him "beyond the date of the payment by him of the amount awarded against him by the trial court as explained therein, and that he should not be chargeable with future costs"; but this declaration was made upon the hypothesis that he would bring matters to a speedy adjustment, not that he would prolong the litigation in the manner he has done. For the reasons herein stated, it is hereby ordered, adjudged, and decreed that the judgment of the district court be, and the same is hereby, annulled, avoided, and reversed, and it is now ordered, adjudged, and decreed that plaintiff, Josephine Beugnot, do have judgment against defendant, Henry Tremoulet, in the sum of $5,861.43, with legal interest thereon from May 9, 1899, until paid, and that defendant pay the costs in both courts.

### On Rehearing.

#### (Nov. 30, 1903.)

PER CURIAM. The court adopted the calculations of plaintiff's brief announcing that any errors therein would be corrected on application for rehearing. On such application it appearing that by inadvertence plaintiff charged interest for one year too many, and credited the commission of defendant in a lump sum at the date of settlement, in-

stead of at the dates when the same accrued, thereby depriving defendant of interest on this commission while interest was running against him on the account, the judgment is accordingly corrected in these particulars, and reduced from $5,861.43 to $4,628.87. Legal interest on this balance to run from May 9, 1898. As thus amended, the judgment is adhered to, and the rehearing is refused.