63 P.(2d) 1042

**JONES v. GREEN et al.**

No. 4158.

Supreme Court of New Mexico.

Dec. 19, 1936.

Wm. H. Patten, of Hobbs, and Potash & Cameron, of El Paso, Tex., for appellant.

Tom W. Neal, of Lovington, for appellees.

BRICE, Justice.

On April 16, 1929, the appellee, H. F. Green (hereafter styled appellee), executed an instrument called "Underwriter's Agreement," in which, among other things, it was provided that appellee would engage in the business of "individual underwriting upon policies and contracts of insurance and re-insurance" and in furtherance of this purpose adopted the underwriter's agreement, which by its terms bound him and others executing like agreements. Among the provisions of this agreement are the following:

That the scope of the business would be the transaction of a general insurance business (excepting life insurance) now or hereafter allowable under the laws of Texas.

"* * * All policies of insurance and contracts relating thereto shall be written and issued by the subscribers hereto under the name of Lloyds America, by and through their Attorney-in-Fact, hereinafter provided for."

Each of the subscribers was required to execute and deliver to R. M. Worley a power of attorney to transact in subscriber's behalf such insurance business, who was authorized to take charge of all funds, assets, and properties belonging to the subscribers or deposited to the credit of any subscriber, "* * * direct the manner in which said funds, assets and properties shall be kept or invested, used or applied; handle and make payment or settlement of all claims; collect all premiums or other sums due, growing out of the transaction of the business herein provided for, and generally supervise and control the conduct of the business hereinabove referred to and safeguard the respective interests of all subscribers, all as more fully set forth in the Power-of-Attorney executed by the subscribers."

The attorney in fact was required to keep separate account for each underwriter, showing the disposition of his deposits, contributions, earnings and losses, etc., to which account he was entitled to access.

"Any subscriber may at any time revoke his Power-of-Attorney and discontinue all future transactions of the business contemplated, and such revocation shall become

binding upon the Attorney-in-Fact ninety days after receipt of written notice to that effect by said Attorney-in-Fact. * * *

"In the event of revocation or cancellation of said Power-of-Attorney, the stipulations and provisions of this Underwriters Agreement and the provisions of the Power-of-Attorney shall have full operation and effect as far as concerns any transaction previously entered into on behalf of said retiring or retired Underwriter, or anything resulting therefrom, before the adjustment and settlement of said Underwriters interest * * *. The account of a withdrawing, retiring, retired or deceased Underwriter shall not be closed until all liability on contracts on his behalf shall have been terminated * * * Upon termination of said Power-of-Attorney granted by any subscriber hereto, whether by death of subscriber or otherwise, such subscriber or his legal representatives shall neither be liable under any contract there after entered into nor be entitled to any rights, interest or profits of an active Underwriter, * * * When the account of an Underwriter has been closed as provided herein, there shall be paid over to him or his legal representatives any property and credits which may be due him by virtue hereof. The interest of every Underwriter in the profits arising from every transaction in which he shall participate as an Underwriter, shall be measured by the proportion which his subscription, as herein provided, shall bear to the total subscriptions of all subscribers severally participating with him therein."

The attorney in fact was given 10 per cent. of gross premiums, less cancellations, for his compensation. The underwriter was required to contribute in "cash, bonds, stocks or other securities," to the guaranty fund of the underwriters, a sum not less than 25 per cent. of the amount of his total subscription; and that the remainder of his subscription should be evidenced by a non-negotiable promissory note subject to payment as a contribution at the discretion of the attorney in fact, and in proportion to the underwriter's interest, to be called for the purpose of keeping the insurance business solvent. That the underwriter should not be liable for the payment of the expenses or losses beyond the total amount he should have to his credit at any one time, and his total unpaid subscription.

"* * * In every policy issued under the arrangement herein contemplated all of the then subscribers shall become insurers and every such subscriber shall become and be severally liable under policy so issued in the proportion which his subscription at the time of the issuance of such policy shall bear to the total subscriptions of all subscribers at that time."

The attorney in fact was authorized to pay from the funds of the underwriters all losses and legitimate expense and attorney's fees, etc. Profits were to be divided on the fourth Monday in January of every year. As a part of this instrument, and attached thereto following it, was a power of attorney executed by appellee H. F. Green, wherein he appointed R. M. Worley of Dallas, Tex., his attorney in fact to act for

him in the matter set out in the instrument previously mentioned; that is, to transact for him all such insurance business, giving full and complete power to do any and all things in connection therewith, to appoint, substitute attorneys in fact, with all powers conferred by the power of attorney on Worley, and "* * * to accept, receive, endorse, buy, sell or collect, hypothecate and/or transfer, in whole or in part, on such terms as my said Attorney-in-Fact may see fit, any script, notes, bills of exchange, drafts, stocks, bonds, property and/or securities belonging or due to or from me by virtue hereof, and to give good discharge for any and all proceeds therefrom; to collect all interest, dividends, profits and income on same; to invest and re-invest as provided in the Underwriters Agreement all funds, assets and properties in their hands belonging to me; to make underwrite, execute, sign and deliver any documents or writings whatsoever for any of the purposes herein mentioned; to do and perform for me and in my name and stead every act and thing not herein especially mentioned which I could myself do in relation to any policies, contracts and/or binders made by virtue hereof and as may be necessary or proper to carry out the intent and purpose of this Power-of-Attorney and said Underwriters Agreement signed by me." By its terms the power of attorney "may be terminated upon ninety days written notice given by the subscriber to said attorney in fact."

In furtherance of these agreements and for the purpose of advancing funds to carry on his part of such insurance business, the appellee on April 17, 1929, executed his promissory note for $5,000, payable on demand after thirty days' notice, to "R. M. Worley and Elliott Jones, or their successors as Attorneys-in-Fact, for the underwriters at Lloyds America," with interest thereon after maturity, at the rate of 6 per cent. per annum until paid. On the same day the appellee (who was a resident of the State of Texas) executed a mortgage on 320 acres of land situated in Lea county, N. Mex., to secure such note, and executed a $5,000 subscription note hereafter mentioned. Thereafter on April 24, 1929, R. M. Worley and Elliott Jones, as attorneys in fact "for the underwriters at Lloyds America," issued to H. F. Green a certificate in which it was certified that Green had subscribed $10,000 as an underwriter at Lloyds America and had deposited with R. M. Worley and Elliott Jones, attorneys in fact for all underwriters at Lloyds America, one $5,000 mortgage note secured by a deed of trust, and one nonnegotiable, nontransferable, noninterest-bearing subscription note for $5,000. That the underwriter should receive from the attorneys in fact all interest and dividends arising from the securities and 6 per cent. per annum on all cash deposited by him, and that he should receive on the fourth Monday in January of every year his net realized profits on the business transacted for him by such attorneys in fact for the preceding year.

This seems to have concluded the organization of this business. Thereafter

certain correspondence was passed between appellee and the attorneys in fact of Lloyds America, from which the court held that appellee had exercised his option to revoke the power of attorney and cancel the agreement, effective on March 1, 1931; after which defendant ceased to be an underwriter at Lloyds America. The other defendants, Snyder and wife and Charles E. Green, were charged as having or claiming some interest in the mortgaged real estate, and made defendants on that account.

This action was brought by appellant to recover on the mortgage note and to foreclose the mortgage. Appellees admitted in their answer the execution of the note and mortgage, but alleged that the note was to be held by appellant as the property of appellee with authority to negotiate or convert it into cash by appellant in order to meet any losses which might be sustained for which appellee was liable on his contract, and that it could be converted or used for no other purpose. That in fact there were no losses occasioned in said business for which appellee was liable, but there·were in fact profits for which appellant should account.

As another defense it was alleged that the appellee on the 31st day of October, 1930, notified appellant of his intention to cancel the power of attorney and withdraw from and cancel the contracts referred to, effective· at the expiration of ninety days from October 1, 1930, as provided by the terms of the contract and power of attorney; and thereupon it became the duty· of appellant to return to appellee his securities and to account to him and pay to him the net premiums on insurance theretofore written; all of which appellant failed, neglected, and refused to do.

Appellees filed a cross-complaint to cancel the note in question because of each and all of the facts theretofore set forth, alleging that the note was the property of appellee and that he was entitled to have the note and deed of trust surrendered and canceled.

The defenses called for an accounting by a trustee to his cestui que trust.

There were three assignments of error, each of which will be considered in its order. Appellant first contends that the district court erred in holding that appellee withdrew as underwriter of Lloyds America and revoked his power of attorney, as found by the court, in that there was no substantial evidence to prove it.

The evidence on this assignment is substantially as follows:

On August 16, 1930, Lloyds America, by J. J. Shields, manager of its Texas division, wrote appellee, in substance, that the Department of Insurance of the State of Texas had placed a value of $3,200 on his deed of trust, and requested him to have the property appraised at a value of $10,000, and stated: "For if this property will not appraise for $10,000.00 it will, of course, be necessary for you to substitute other security to make up the difference or to reduce the subscription accordingly." Appellee testified as follows:

"Q. Shortly after receiving that letter, then, did you write to Lloyds America a letter exercising your right under your contract and power of attorney to withdraw as underwriter of insurance? A. I did, after I received that letter.

"Q. About when was it that you wrote? A. I don't remember just how long afterwards.

"By the Court: Q. Do you have a copy of your letter? A. No, sir; I have an answer from them.

"Q. What did you say to them in that letter? A. They wrote me, wanted me to put up more collateral. I didn't have it. I decided I didn't want to be a member. I wrote to them and told them I wanted to withdraw. That was about all there was in the letter, and they told me I had ninety days to notify, notify them in 90 days I would withdraw."

In answer to appellee's letter, Lloyds America, by Elliott Jones, attorney in fact, wrote him on November 10, 1930, stating that he inclosed a statement of account, and stated further: "According to Article 4 of the Underwriters Agreement which every Underwriter executes, it is necessary to give us ninety days' written notice signifying your desire to withdraw. At the end of that time your account is figured up and may be liquidated on the basis of its condition at that time. However, it is within the province of the management of this organization, under the terms of your Underwriters Agreement, to hold your securities until the policies on which you have been an insurer in the past have expired; but ninety days after receipt of your notice that you wish to revoke your power of attorney, you cease to share in any losses, or participate in any profits or earned premiums in the future. Your account remains and your securities are held in suspense until the policies on which you have been an insurer in the past have expired. * * * It may be that after reviewing the statement you will not want to withdraw." And further stated reasons why appellee should not withdraw and: "But if you still wish to withdraw, ninety days must elapse and the account liquidated on the basis of the figures at the end of ninety days." And then: "* * * We suggest, before making any decision in the matter, that if you are going to be in San Antonio or Dallas at an early date, you call and see us. The workings of an insurance company could then be more intelligently explained to you, and we assure you that it would be a very great pleasure to us to go into this matter in detail with you. We believe the result of same would be that you would be content to remain as an Underwriter, because of the fact that as long as you remain as an Underwriter, you are not charged with anything for organization."

Appellee, on November 8, 1932, wrote appellant a letter requesting a release of the mineral rights from the mortgage sought to be foreclosed in this action; also in a deed from appellee to appellee Charles E. Green, conveying this property, there was a recitation to the ef-

fect that the property was free and clear "excepting a certain deed of trust in the sum of $5000 in favor of Lloyds America Insurance Company, taken as collateral security, and which said second party assumes and agrees to pay." The evidence substantially supported the finding of the court to the effect that the power of attorney was revoked and that appellee ceased to be an underwriter in Lloyds America. The evidence was certain that appellee had requested the cancellation of the contract. The indication was that he was withdrawing from the whole transaction. He stated: "I decided I did not want to be a member. I wrote to them and told them I wanted to withdraw." All of the contracts were so bound together that they really constituted one transaction. A withdrawal from the insurance contract necessarily revoked the power of attorney. We are satisfied that Lloyds America so understood appellee's letter. It is contended that oral evidence of the contents of the lost letter should not have been admitted by the court. Aside from the fact it was not objected to, the appellee did not keep a copy of the letter; but appellant received it. Its witness claimed to have in his possession in court all of the correspondence between the parties, but this letter was not produced. Under the circumstances availing objection to the admission of secondary evidence to prove the contents of this letter cannot be first made in this court.

Appellant's second point is as follows: "H. F. Green became an underwriter at Lloyds America in 1929, and thereby entered into the insurance business on his own account and made Jones and Worley his Attorneys in Fact to transact the insurance business for him. Business was carried on in accordance with his Underwriters' Agreement and Power of Attorney, and in accordance with the Lloyds plan. He had a right to withdraw and revoke his Power of Attorney, subject to the conditions contained in his written instruments, which, among others, was a written notice of ninety (90) days and an accounting for the losses, if any, sustained for his business. The Trial Court ordered an accounting (R. 103–4), but the court held (R. 156) that a detailed accounting had not been made and rendered to the defendant. But inasmuch as the plaintiff seemed unable to comply with the original order of the Court to produce the books and bring them from San Antonio, Texas to Lovington, New Mexico, we now assert that we should have an opportunity to render an accounting by other competent evidence—that is, by depositions rather than transporting the books several hundred miles as originally ordered by the Court, and the case should be reversed for that purpose, and the other underwriters should not be required to bear the losses of Green's business, and there is no evidence to support Finding No. V (R. 50) and the Judgment."

In the midst of the trial of the case the proceedings were stopped and the court made certain findings of fact, among them the following: "That the defendant is liable to the plaintiff for any losses which may have been sustained for his portion of

its business as an underwriter, prior to January 1, 1931 but that the plaintiff will be required to make a complete accounting of the transactions between itself and the defendant, and of the business written in his behalf, so the court may determine the true status of the account between the parties; and so long as there is any liability on insurance written on behalf of the plaintiff prior to January 1, 1931, I will not cancel the note or mortgage but will enter a decree as conditions arise."

Then the following occurred:

"Mr. Neal: In that connection, I think we would have the right to have the books and papers of this company pertaining to those transactions here in the jurisdiction of the court, where we could examine them within a reasonable time.

"The Court: The plaintiff will be required to produce the books and papers for examination by the plaintiff, by the defendant, prior to the subsequent hearing.

"If you don't want to make an accounting, I will dismiss your complaint. This case will be continued for the taking of further proof until the further order of the court, for the taking of proof on the status of the account of the defendants and the plaintiff Lloyds. The plaintiff will be required to establish by competent evidence the extent of defendant's present liability under the findings heretofore made."

Thereupon a recess was taken from the 11th of October, 1934, until March 29, 1935, at which time the case was again called for further proceedings. The appellant appeared without the books of account ordered to be brought into court, claiming that they were too voluminous to be brought, which in fact the court found. But it appears that appellant had waited all this time without filing the accounting that had been ordered by the court. Appellant stated to the court, in substance, that he was asking for judgment on the note and foreclosure of the mortgage; that the appellee had introduced no evidence to support his answer, and: "Our position is we are brought into court here, now, to furnish evidence for the defendant." The court stated:

"The Court: * * * You have possession of the books and papers, you took the man's note and mortgage and undertook to manage the business under a contract which provided that each account should be kept separate. Now, you have sued on the note and mortgage and I am not going to give you a judgment unless you make an accounting to him and show the extent of losses on his business. * * * My holding is it is incumbent upon the plaintiff to show the extent of loss on the transactions had on behalf of this man. * * *

"I understand that this note was given, they engaged in this business, was given by way of indemnity as capital for this enterprise; that it is incumbent upon the plaintiff before it is entitled to foreclose here to show there has been loss sustained. This man has withdrawn, which he has a right to do. If you are not here with your books and papers to show the extent of the loss the complaint will be dismissed."

Appellee then offered a statement of balances showing losses of appellee on account of the insurance business. This the court held did not comply with his order, and thereupon judgment was entered dismissing appellant's case with prejudice, and a decree canceling the note and mortgage in question, on appellee's cross-complaint.

It is apparent from the above that the district court took the view that, as the contract was at an end and the power of attorney revoked, the action had resolved itself into an accounting; that as appellant was a trustee handling the business of the appellee, it was encumbent upon him (he having in his possession all the information, books of account, etc., of the trust) to produce them in court; or by a deposition to establish the differences between the parties; in short, that the burden of proof was upon the appellant to establish a balance in his favor before he could foreclose the mortgage. The contention made by appellant in the last hearing, to the effect that they were not required to bring in the evidence ordered by the court, seems not to have been relied on here, as shown by point II, above set out. The contention here is that appellant should have had an opportunity to render an accounting by deposition rather than by producing the books in court; that the case should be reversed for that purpose, so that other underwriters will not be required to bear the losses of appellee's business. If, as conceded by appellant here, it was his duty to make the accounting as ordered, then opportunity and time were not lacking. The court was adjourned for some months for that purpose, in which time depositions, written or oral, could have been taken and the information supplied as evidence. But the appellant appeared a second time before the court without complying with the court's order and without having furnished any evidence in the nature of an accounting to show the balance due him if any. There is no claim made in this court that such balance could not have been struck, or that it was not shown by the books of appellant. We think the court was authorized under the circumstances to dismiss the case, and we see no reason why we should reverse the case with instructions to permit an accounting at this time. Appellant had the opportunity (in fact was ordered) to make an accounting and refused to do so. No objection was made by appellant in October to the order of the court requiring him to bring in the books, and not until the final hearing in March following was the objection made that the books were too voluminous to bring to New Mexico. There is every indication that appellant was trifling with the court and refused to obey its orders. Under such circumstances this court will sustain the district court.

Appellant's third point reads as follows: "When a case is on trial and no competent evidence is offered to support the allegations in the Complaint, or in the Cross-complaint, then the only judgment that can be rendered by the Court is a dismissal of the case without prejudice. No affirmative relief can be rendered except upon evidence. A judgment must be sustained by the evi-

dence. The only judgment that could be legally rendered in this case was a judgment of dismissal of plaintiff's cause of action as alleged in his Complaint and a judgment of dismissal of the cause of action alleged in defendant's Cross-complaint. A judgment granting affirmative relief cannot be legally rendered on lack of evidence."

The court, in substance, held, as we have shown from statements made by him, that this action was in the nature of an accounting, in which the appellant had the burden of proof. This is conceded in this court by appellant's point II, which we have just disposed of. The note being only a guaranty, the appellee had the right to have the note canceled if the appellee was not indebted to appellant on account of the insurance contract which had been canceled. As the parties agree appellant had the burden of proof, which he failed to meet, there was no evidence of any indebtedness to appellant on which the note or its proceeds should be applied. Under these conditions the court correctly canceled the note. The point was raised in the district court that the burden was on appellee to establish that there were no losses for which appellee was liable. This question is not raised here, but we find that the district court correctly held that the burden was upon appellant to account to appellee. He occupied a fiduciary relation as trustee and attorney in fact; had all the facts and evidence of the condition of the accounts in his possession, and he alone could furnish it. After appellant had introduced evidence to prove the trust, delivery of the note, that

some trust business had been transacted, and the appellee's withdrawal from the business, the burden or duty was then upon appellant to render an account of his trusteeship as ordered.

The agreements executed by appellee show he had an astonishing confidence in appellant or else appellee was easily imposed upon. No doubt the documents were prepared by appellant and he did not fail in any particular to take upon himself full, complete, and absolute authority to handle appellee's business as he pleased. The trust was to that extent his own creation and he should be held to a strict accountability.

"A trustee or executor is bound to keep clear, distinct, and accurate accounts. If he does not, all presumptions are against him, and all obscurities and doubts are to be taken adversely to him. The burden of proof is upon a trustee to show that the charges or expense for which he claims credit upon an accounting were proper disbursements. If he enters these accounts in his private books, he is bound to produce the books, although such books contain his private accounts; and even if he enters the accounts of the trust in the books of the firm of which he is a partner, the books must be produced." 2 Perry on Trusts, § 821.

"The law assumes that he knows all about the transactions involved and he must reveal the true facts. 39 Cyc. 476; 2 Perry, Trusts, § 821; 3 Pom.Eq. 1063. If he claims credits, he must prove them. Choctaw, etc., R. Co. v. Sittel, 21 Okl. 695,

97 P. 363. It is not necessary for the cestui to show that there is anything his due. Frethey v. Durant, 24 App.Div. 58, 48 N.Y. S. 839." Stockwell v. Stockwell's Estate, 92 Vt. 489, 105 A. 30, 31, 32.

See Johnson v. Redfield, 149 Wash. 618, 272 P. 55; Freeman v. Donohoe et al., 65 Cal.App. 65, 223 P. 431; Knowlton v. Fourth-Atlantic Nat. Bank et al., 271 Mass. 343, 171 N.E. 721; Villa Site Co. v. Copeland, 91 N.J.Eq. 503, 111 A. 39, 13 A.L.R. 356 and note; Equitable Life Assurance Society v. Winn, 137 Ky. 641, 126 S.W. 153, 28 L.R.A.(N.S.) 558; 65 C.J. Title Trusts, § 799.

And when appellant refused to account, after he was given every opportunity to do so, the presumption is that such accounting would not favor him.

"Where one party is due to account to another, his refusal to do so warrants the presumption against him most favorable to his adversary from the then state of the record; for it is to be supposed that, rather than suffer default upon the matter expressly charged, the party accused would answer so as to reduce the amount could he do so conscientiously. Accordingly it is held that the court may enter decree upon such default and contumacy, treating it as an admission against his interest by the party, and affording a sufficient quantity of evidence to justify the chancellor in so proceeding to judgment." Equitable Life Assurance Society v. Winn, 137 Ky. 641, 126 S.W. 153, 155, 28 L.R.A.(N.S.) 558.

If justice has miscarried in this case, then the fault lies with appellant and not the court or the appellees.

The judgment of the district court will be affirmed.

SADLER, C. J., and HUDSPETH, BICKLEY, and ZINN, JJ., concur.